184111 Susan Bender v. Champlain Enterprises LLC oral argument not to exceed 15 minutes per side. Mr. Conway for the plaintiff appellant. Good morning, I'm attorney Mike Conway, I represent the appellant Susan Bender. I'd like to reserve five minutes for rebuttal. May it please the court, this case is a wrongful termination and violation of the Ohio Public Policy case. There are four assignments of error on appeal. The short and fast of the case is that my client who's a technical publications writer and editor was fired by Champlain Enterprises aka Communair when she blew, in effect, blew a non-statutory whistle on the way her boss, Joan Callahan, was requiring her to create unsafe aircraft operations manuals. The evidence shows that the manuals sometimes had what's called change bar software problems that would erase text, cover up text, things like that. Sometimes when they're printed they have black streaks across them making them not possible to read. Not only that, my client complained about how she and her crew needed training in GEPS charts, which are fancy navigation charts. They're used by the airlines. Now these aircraft operations manuals are over 600 pages long and my client noted there's hundreds of errors in them sometimes when they were edited. My client made several complaints to her boss, strike that, to the HR manager, Susan Prince, and later on David Hewitt, employee relations manager, that she was having problems with Callahan because of the way she was interfering with her work in creating accurate AOMs, aircraft operations manuals. What started out as an attempt to actually help the company do its job better and create these safe manuals, the manuals are by 14 CFR 131.125, which is a statute that requires them to be created with a high degree of safety. There's no shortcuts. These aircraft operations manuals end up on airplanes and pilots use them and if they can't be read you've got a disaster waiting to happen. Is there any evidence that any of the manuals had incorrect information in them? Are all the complaints just to the way they were printed or typos? Can you point to anything in the manual that was incorrect as far as safety goes? The record is that there's no evidence the errors made aboard the aircraft, thank God, but that's really not the issue. The issue is my client... Will you answer my question though? Is there anything in the manuals that's being alleged that was incorrect? There were, but it was caught. What was it exactly? Well, there's hundreds of errors. Examples, you'd have a change in the checklist. AOM would have, for example, maybe weight and balance information for the ERJ 145. The manufacturer might say, we're changing some specification. Well, the manual has to be changed. The software would have to make changes to all the manuals simultaneously. That's what the change bar software does. The problem was my client was complaining that text was disappearing out of these manuals, these electronic versions of these manuals and being overwritten. Now, my client was responsible for getting Communair's aircraft, the ERJ 145, certified for its flights because she managed to get these AOMs put on board the planes after the FAA approved them. But the fact of the matter is she was disciplined for making complaints about the boss when she complained about these problems, and that's where the public policy tort comes in. Under Kolch, under Petlinski, under the Wiles case, under Grayley, and the public policies and the aviation statutes that I've cited, and the case Zach v. Huyckamp, it's clear that the public policy of Ohio is violated when you fire an employee in the aviation business who's blowing a non-statutory whistle about how aircraft operations manuals are not safe. What do we do about the fact that she wasn't just going up the line of command, that she was constantly talking about her to other co-employees in the workplace? That's disputed, Your Honor. Those accusations came in after my client made her complaints. There were three major complaints in emails expressing safety concerns that the district court apparently skipped over in its order dismissing the case. My client's last safety complaint was on January 19, 2017. She was fired a week later, and the excuse was she's in subordination. Well, even the operations manager, Jason Conrad, testified in his deposition that he had no evidence that my client ever told a lie about Callahan, and there's no evidence that my client ever said anything that was untrue about Callahan. But it could be true and still insubordinate, right? Well, Your Honor, here's the problem. If every time someone complains about the boss doing something unsafe and trying to talk to co-workers and check to make sure they're not being asked to do something unsafe too, if that's insubordination, you can never make a complaint and not get fired. But weren't there lots of complaints that didn't have anything to do with safety? I mean, as I understand it, the safety issues are the change bar issue and the black streaks on the manual. And the black streaks on the manual, she admitted, well, that was fixed after I printed three pages. So we're really talking about the change bars, and then there's a whole bunch of other stuff that's like workplace disagreement, which I have no idea the character of these people or their relationship, but it all seems to be workplace relationships rather than safety concerns. Your Honor, I disagree with that because what they did was they took my client making complaints about the boss not training them, causing change bar problems, causing black streaks, undermining my client's work, taking credit for work she did and problems she fixed. All these things go to my client saying, look, I've got a supervisor who's undermining my work and she's undermining company safety and we have to do our job with safety here. And in an effort to defend itself, after she made these complaints in January, after she offered to resign over it and then didn't because she just decided to stand up for her rights, the company said, you say anything about the boss again in that January 11th letter of instruction and action or whatever they call it, we're going to fire you. The problem is my client's being gagged. She can't make any safety complaints. And if that's the case, the public policy can never be vindicated because she's being censored. And this is the problem with this case is that we've got a jury trial question because it has to be examined as to is their definition of insubordination, criticizing the boss for doing something unsafe. And by saying, oh, no, you're talking about all these other people, well, that's what they did after they got in trouble with her making the complaints. Go ahead. I was just going to ask, can we talk about the public policy exception? Sure. What is it that you think? I understand that you resist the Dean Mercy health test, but I'm not sure what test you think we ought to apply to decide whether something violates Ohio public policy and would give rise to a cause of action. Your Honor, the trouble is, it's not trouble, it's just fact. The Ohio Supreme Court, and I've argued five of these things in front of the Ohio Supreme Court, most recently in April in the House v. Iacovelli case, waiting on the decision on that, the whistleblower statute is for reporting crimes in imminent dangers. It has nothing to do, I mean, with lots of greely type claims. What if someone got a call at 8 o'clock in the morning and the boss is on the phone and says, you know, don't come into work today, you're fired, because I heard you voted for Kamala Harris in an election yesterday. Would that be a greely claim? Yes. Would it be able to be brought under the Crowley or the Hale or the Crowley standards? It's got to parallel the whistleblower statute? No. That just sounds like you don't think the Ohio legislature has extended sufficient protection to the sorts of claims that you think it should protect. I don't know how we're supposed to, we're a federal court sitting in diversity, so help me locate in Ohio law a way to interfere. Your Honor, the Pitlinski case, the Colch case, the Greeley case, those Supreme Court cases, Wiles, they all say that public policy to our claim is not, does not have to be dependent on a statute that regulates employment relations. It does not have to parallel the whistleblower statute. The whistleblower statute is for fact-specific situations that are not involved in every Greeley case. And if you say that Greeley claims have to be based on statutes that follow whistleblower policy, that defies Colch, because the Ohio Supreme Court in Colch said that's not the case. This court expressly said in that case you do not have to follow whistleblower statute. They're apples and oranges, they're two different things. The public policy that's being vindicated is the requirement that the plaintiff be allowed to make a complaint about an issue like workplace safety and not get fired for it. It may be a whistleblower type case, it may not be, but there's never been a case decided by the Ohio Supreme Court that said, you've got to parallel the whistleblower statute. The standard is the standard the Ohio Supreme Court put down in those cases. What the Hale decision does is it tacks on additional requirements that the high court in Columbus never put into these cases. Greeley never, for example, dealing with, I'm out of time, shall I continue? Just finish this, yeah. Okay. Greeley never dealt with, I mean Greeley dealt with a situation where someone got fired for a situation where the employer didn't want to pay child support payments. They didn't want to be burdened with that. Didn't even involve an employment related statute. And the Supreme Court of Ohio said, wait a minute here. You can't fire somebody because the employer's burdened by a statute that protects the employee's rights. And that's what started this. There's never been a case published where the high court has said, you've got to mimic or follow the whistleblower statute. And it's an unworkable standard across the board because in the four-point Collins test, it's just not an element of it. And I'd just like to say, you know, I'm out of time. Should I vacate some of my rebuttal to keep going? That's up to you. You're still answering this question, so just wrap it up. Okay, Judge, thank you. The fact of the matter is, is that the cases that I've seen that the district court cited, McDermott v. Continental Airlines is another one, for example, they're tacking on requirements that Columbus has never required. I mean, burden shifting doesn't work in these kinds of cases simply because the employer has to rebut each element of the four-point Collins test as it goes through it. There's no prima facie to then shift something to. Thank you. Thank you, Your Honor. Good morning. May it please the court. My name is Evelyn Schoenberg. I represent Champlain Enterprises, LLC, doing business as Commute Air. I will refer to Appley as Commute Air, so there's no confusion. If I may just pick up on what my opposing counsel has said about the clarity element under Ohio law. We discussed this in our brief to the court. There was a case, the McGowan case, an Ohio appellate court that actually reversed a trial court, a jury verdict that had granted $800,000 of damages to the plaintiff in that case under the Greeley public policy argument. And they reversed that specifically because of the public policy contention in that case not meeting the Dean three-part test. But that wasn't the one that was vacated? Then the Ohio Supreme Court did take granted review of it and then vacated its decision to grant review. Did it vacate the appellate court decision? I'm sorry. It had granted review and then said we're not going to review it. And it stayed the appellate court as is, the decision. And my point in bringing this up is if indeed the Ohio Supreme Court in Columbus was going to address that element, it had that opportunity to do so at that time. That was two or three years ago. Didn't it say it wasn't presidential? It totally did. Yes, absolutely. But I bring it to show, and I believe it shows, that what the Sixth Circuit has done in the Hale decision and continues to adhere to continues to correctly reflect Ohio law under the clarity element. In other words, the three-part Dean test. Right. So your argument is, I mean, we're a court sitting in diversity. We have to try and figure out what Ohio law is. The Ohio Supreme Court hasn't told us. Ohio doesn't have a unified appellate court system. So we have to figure out from some district decision that doesn't bind other districts, what's the right answer. And your position is that the Dean test is the right test because the Ohio Supreme Court could have fixed it if it didn't like it. That is one of my arguments, yes. The other argument is I do believe the Dean court did correctly review, assess, analyze, and come to its conclusion that, indeed, in order to have a real exception, employment at will is a doctrine. There are exceptions. The exceptions are narrow. And to have such a narrow exception, it is correct under Ohio law to say, well, you know what, if it's going to be a public policy wrongful discharge tort, the policy at issue should reflect the whistleblower statute. And so then the Dean three-part test comes with those three elements. And if you apply those three elements to the public policy at issue herein, as the district court correctly found, we believe, indeed, that regulation does not meet either of those three elements. It doesn't prohibit, impose a duty on the employee to report any violations. It doesn't prohibit any retaliation. But if that just seems to me that those requirements are inconsistent with just about every wrongful, you know, public policy wrongful discharge case that's been decided. With all due respect, I can't agree with that. With all the public policy, we're talking about the clarity, just the clarity element. You know, from the Greeley case forward, the public policy at issue must clearly protect the public's interest. Yes, but there wasn't necessarily a duty to report. Under Ohio whistleblower, you do need a duty to report. I mean, that does require it. But it's a three-part test that has three different elements. So one is the duty to report. If that doesn't exist, okay, does retaliatory matter exist in there? No. Then the third part, and they don't all have to be met, it just doesn't meet one. So the third part, then, is does it indeed protect the public health and safety? And that's, I think, how the dean part does correctly assess the clarity element under Greeley. Okay, let me just ask you a question. Is there a difference between the third possibility of dean and the first requirement of the four requirements? Is there a difference between that and the clarity test? I see where you're going, and I have to agree that there does seem to be somewhat of a resemblance to both. But under the dean test, under the Ohio courts that have followed the dean test, and under this circuit's decisions, that third element of the dean test is looked upon as much more closely than, I believe, what Greeley has done, and the Ohio appellate courts are following that. I mean, all this court did was adopt what Ohio courts have been doing. And, again, when you look at the fact that we're talking about a narrow exception to the employment at will doctrine, I believe imposing those, digging down, if you will, in the clarity element, digging down and seeing, okay, are any of these three elements there that ensures that, indeed, there is going to be continuing employment at will without gigantic exceptions, which you would just eliminate the doctrine totally. Okay, do you lose if? No, no. And this is what I know we spend a lot of time on causation. In the briefs, we spend a lot of time on causation. What the district court did below was say, okay, even if it's presumed causation element has been met, let's go in and examine the next three elements because, as we all know, under the Greeley test, the appellant needs to meet all four elements. So the district court went on to the jeopardy element, and it found in reviewing the jeopardy element, again, applying Sixth Circuit law, which we argue correctly applied Ohio law, the three elements to dig into, if you will, the jeopardy element, the district court said, okay, the first element that there's the clarity element met, we agree with that, the district court said. However, the second element, whether the employee's conduct fell within the scope of that policy, that's where the district court disagreed with the appellant's argument. So, in other words, there was a lot of complaints made by this appellant. What the district court found by looking at all those e-mails, pages of e-mails, her testimony, the testimony and averments in the affidavits of her coworkers, that her complaints were indeed not safety related. They were not related to a public policy. They were related to her own savior of her job, her own vindictiveness, if you will, or dissatisfaction, disrespect of her boss, Joan Callahan. And, therefore, they were not brought in any kind of good faith to bring forth a safety issue. Instead, they were brought, and they began, and it's very clear in looking at her own e-mails that she wrote herself. It began with her saying, I don't trust my boss. I don't respect my boss. She's not qualified. But it was all about the work. I mean, it was all about her actions relative to the manuals. She wasn't saying, I don't trust her because she's going to take our stuff. She said, I don't trust the instructions that she's giving us because she doesn't know what she's doing. That was her belief, her subjective belief, and she voiced it above Ms. Callahan's head, over to the Ms. Callahan's superiors, and then subsequently to HR, and she was disagreed with. She wasn't getting her point across to them. They didn't agree with her. And to zero in on safety, I mean, there's production of a manual, and some of it might have to do with all kinds of different issues. It could have to do with typeface. It could have to do with a lot of different things. But the safety complaints, as far as I know, are only the change bar issue and the black streak issue. I believe it's only the change bar issue if you look at the safety complaint of the January 19th, where that was the email that said possible safety issue. Well, why isn't the change bar issue a live issue? As explained by Ms. Callahan in her deposition, with the change bar issue, what the appellant was explaining and trying to say and did say in her emails simply wasn't the case. Callahan had said there was a different way to insert the change bars, and they would show up, and they indeed did show up. What the appellant was arguing in her incessant emails was there's another way to do it, and I have a better way. And if you really dig into those emails, I think it does become apparent. She was upset that Callahan had not adopted her own way. She felt she had a better way to improve or change. But she also thought she had a safer way, that she was complaining that the way Callahan was doing it had the potential for changes to disappear or for material to disappear. And that's what she had conveyed a number of times beginning early December, and it just wasn't the case. But does the law require that the complaint be correct? No, it doesn't, but the law does require it be brought in good faith. So what began as I've got a better way. The law requires what? That the complaint be brought in good faith under the jeopardy element. Well, but that's a jury question. It's a question of fact, but it could be when there's no opposing evidence in the record. Taking the record as a whole, taking her complaints about Callahan as a whole, taking the disruption that she caused in her department as a whole, one has to begin to question, what was her intent? Was her intent truly to bring forth an issue that would in fact impact the public health or safety? Or was it to justify her own job, get back at her boss for not giving her the credit she felt was due to her? Well, I mean, it was pretty clear that she wasn't going to affect Callahan's job. So one could reasonably infer that it was really about those bars, and she felt that the information had a chance, the possibility it was going to disappear. But then she should have said that. But she did, again and again. No, not really. No, she was just saying, I have a better way to do it. There's two ways to do things, and it's one thing to consistently say, well, I've got the better way and this is the way we have to do it, and when not just her boss but her boss's bosses and the FAA are all saying, no, no, no, this is good, and she continues to go at it while at the same time calling her boss a spoiled brat, calling her boss all these names. When you say and the FAA, the FAA tells them how to do it? The FAA, as the evidence in the record shows, Justin Conrad, who is the director of ops and a pilot in charge of the entire department, testified. No manual gets published without the FAA's final approval, and there's a multi-step review process. I was wondering where the federal regulation was going to fit in here and where there was some federal enforcement mechanism. So the argument is they went through all these steps to create a manual in compliance with FAA regulations, and ultimately it doesn't get into the pilot's hands unless the FAA goes through a review process and says, yep, these change bars look good, yep, no black streaks, yep, we can read it, yes, it's got all the relevant information. And so, I mean, presumably it's safe. I understand the FAA makes mistakes, but there is a check. Not only is there a check, there's a multitude of checks, and what the court must keep in mind is the appellant was a word processor, basically. She had zero experience in aeronautic industry, unlike her coworkers, Marco Nendovic particularly, and she was making conclusions based on only her role in this very low, the lowest, if you will, place in the totem pole. She was simply told what to do by the SME, the subject matter expert, who was a pilot typically, to input literally just as if we would tell a secretary to input information, and then it would be reviewed multiple times, multiple times up the chain. She was not involved in that. Also, there were yearly and sometimes more than yearly audits, and she was never involved in any of those audits of the manuals. She was at, as Justin Conrad said, at the bottom. That's all she did. Input that, and your job's done. Move on to the next manual. And so for her to be coming forward, as she did, constantly, that's where we believe the district court found correctly that, wait a minute, there's a point in time when these incessant complaints about the same issue for a month and a half, and they get morphed into different ways and different reactions. What's the good faith here? What's going on here? And then in between all that, there is a ton of disparagement that she is engaging in against her manager. She had been warned twice before the January 19th email and had been told, you have to stop doing this. I see my time is up. May I finish up? Just wrap up. Thank you. And that's why we believe, and as a judge did find, even if causation may be found, okay, we're going to still look at jeopardy. Even if jeopardy, she found jeopardy was not found. Nevertheless, the judge went to the third element, the causation, didn't find causation, for all the reasons that I've been discussing, and also said, well, even if causation is there, let's look at the overriding justification element. And the appellant has no evidence whatsoever that the decision to terminate had anything to do with any safety complaint. And therefore, Your Honors, we believe that the judgment of the judge below is correct and should be affirmed, and I thank you for your time. Thank you. Thank you. Thank you, counsel. May it please the Court in rebuttal, I'd like to note that in Exhibit 2-19 and 2-20 in the record, which is 2-19 and 2-20 in the record, which are plaintiff's exhibits in Opt MSJ, it's the January 19, 2017 email my client wrote to Justin Conrad and Jake Lofting and John Dark. And she said, watch the videos on the disappearing change bars. This is Aircraft Operations Manual. I don't want it on my conscience if the pilots are looking through the 600-plus page E145 AOM for the changes and they don't see them all because the change bars disappeared out of the file because they're tied to paragraph tags. I'm letting John Dark determine if that is a safety risk. We do have a safe, correct way to add, delete single change bars that I found for us where they will never disappear unless we purposely take them out. I tried informing Joan about this and she ignored it. You three are pilots and can determine if this is a safety risk. But then she wasn't fired immediately after that letter, right? A week later she was, Your Honor. But that's after they asked whether the comments were still continuing, right? Your Honor, we dispute the veracity of the affidavits that the defendant put up to support the Remus J. The fact of the matter is my client made three main safety complaints and after she talked to David Hewitt, employee relations, at the end of December 2016, he went out looking for something to get my client with to get her fired. He went and talked to her coworkers and asked her what she's saying about the boss doing these other things. They went digging for information. My client had had enough, decided to consider resigning over it, then came back, and then they said, If you keep disparaging the boss, we're going to fire you. And their definition of disparagement is contesting how the boss runs the workplace and it's all about safety. My client's not some mere word processor. She's a computer scientist. And the record shows she knows more about the Framemaker software than anybody that she worked with. And all the emails show she's trying to fix problems. She's getting beaten down by the company every time she tries to do it. And they say her standing up is insubordination when she's acting in the interest of aircraft and aircrew and the public safety. What about your opposing counsel's point that the supervisor had a different way, she says there's a different way to have done this correction for the bar error? What's in the record about that? Your Honor, my client came up with a better way to do something, and that's what she's supposed to do. That's what any employee is supposed to do in a technical business. I don't see how that buys them anything. The fact of the matter is, my client's job is not to suggest it. Is there evidence in the record about this alternative method? Yes, Your Honor. In the emails, like the one I just read, my client's demonstrating a better way to do something. I'm talking about the alternative method that the supervisor had. What's in the record about that? She didn't know what she was doing is what the record is. The comment about the FAA review, the reason the FAA is involved in this, I mean, the reason the discussion came up, my client had to fix errors Callahan created in AOM so the FAA could approve them. She was there working throughout weekends fixing problems that Callahan caused. But all of that sounds like she's unhappy about her working conditions. If ultimately the FAA is going to check it, how is it a safety issue? So maybe Callahan's way is cumbersome, it's difficult for the employees, it makes them have to work weekends. All of that sounds like not a nice place to work, but if Callahan's way gets the job done so that it's safe, even if it takes more time, it's not a safety complaint, it's a workplace complaint. The company policy on safety is that everybody at that company has to contribute to safety. My client did it, and they're holding it against her. The idea that the boss likes the way to do something is great, but she was making mistakes, and my client blew a non-statutory whistle on it. And she's not required to use a whistleblower statute. I'm not sure the facts fit within the definition of whistleblower statute. Greeley and his progeny never required anybody to parallel the whistleblower statute in making these claims. What is Callahan's job? Callahan was a supervisor, and when I even asked Laura Prince, HR Director, who is more qualified, her or my client, to judge the issues here, and it was my client. And the fact of the matter is that... So she's a supervisor of what? Technical publications. Her background was she was a jet aircraft mechanic, I understand, and she got injured in a workers' comp claim. The company decided to keep her. They put her in charge of tech pubs. She has no training in it. But she did know something about repairing jet aircraft. Well, I'm a pilot too, Judge, but the fact of the matter is that you have to check, double-check, triple-check, everything in the aviation business. And the fact that the FAA may eventually approve something doesn't mean you let it go and hope they'll catch it. Look what happened with the 737 MAX aircraft. The errors with the onboard automatic pilot system. I was taught you just pull a circuit breaker if that happens. These guys couldn't even... They didn't even know what to do because the manual didn't have it in there. So the bottom line is you can't just let stuff go hoping someone else will catch the error. You have to fix this problem. And the fact of the matter is we have a question of fact for trial about why my client was terminated. They say it's insubordination, which they can't define. And I'm saying, no, the determinative factors here, if you're using an OJI public policy tort claim during instruction, the determinative factor is she made safety complaints. They recharacterize that as insubordination, as justification to get her fired because they know they're probably getting sued if they do it. So here we are. Counsel, your time is up. Thank you. Thank you, Your Honor. Thank you both. The case will be submitted.